UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| EDWARD D. RODGERS, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case no. 1:23-cv-00077-SNLJ |
| KELLIS THOMPSON and DR. | ) | |
| CHRISTOPHER MONTGOMERY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant Dr. Christopher Montgomery's Motion for Summary Judgment [Doc. 88] and defendant Kellis Thompson's Motion for Summary Judgment [Doc. 95]. The motions are fully briefed and ripe for disposition. For the reasons stated below, the motions will be **GRANTED**.

## I.    PROCEDURAL BACKGROUND

Plaintiff Edward D. Rodgers, II, filed this *pro se* action pursuant to 42 U.S.C. § 1983, alleging defendants violated his constitutional rights when they used unreasonable force to arrest him and failed to treat his serious medical condition while incarcerated at the Butler County Jail. Defendants Butler County Sheriff's Department, Damien Smith, and Randal Huddleson were dismissed without prejudice on August 15, 2023. [Doc. 6]. The official capacity claims against Dr. Christopher Montgomery and Kellis Thompson were also dismissed. [Id.]. The remaining claims are against Kellis Thompson in his individual capacity for unreasonable force in arresting plaintiff and against Dr.

Christopher Montgomery for his failure to treat plaintiff's alleged serious medical condition while incarcerated at the Butler County Jail. [Doc. 1].

Kellis Thompson and Dr. Christopher Montgomery have each filed a motion for summary judgment alleging that they are entitled to judgment as a matter of law on all claims brought against them. [Docs. 88, 95]. Plaintiff opposes both motions. [Docs. 101, 102, 107, 114].

## II.    FACTUAL BACKGROUND

The following facts are undisputed except where otherwise indicated:

### A.  Kellis Thompson

Investigator Kellis Thompson has been a law enforcement officer with the Butler County Sheriff's Department since 1999. [Doc. 97 at ¶¶1, 2; Doc. 97-1 at ¶¶1, 2][1]. On November 13, 2020, Investigator Thompson responded to a residence to assist in the investigation of a report of a gunshot victim at the residence. [*Id.* at ¶6; Doc. 97-1 at ¶6]. During that investigation, Investigator Thompson determined that a gunshot victim had been shot by another individual; and, the suspect in that shooting was identified as Eddie Rodgers, the plaintiff. [*Id.* at ¶¶7, 8; Doc. 97-1 at ¶¶6-8]. During the investigation, it was

---

[1] Plaintiff references in one of his memorandums that he does not understand how defendant can submit a statement of facts using an affidavit when defendant Thompson has not been through or answered questions at a deposition. [Doc 102]. He does not specifically seek to have the affidavit stricken, but the Court feels obligated to elaborate on this point. Federal Rule of Civil Procedure 56 allows for the use of affidavits or declarations. *See* Fed. R. Civ. P. 56(c)(1)(A). Any such affidavit or declaration must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. (c)(4). This Court finds that Investigator Thompson's affidavit [Doc. 97-1] satisfies this standard and is admissible in support of his motion for summary judgment.

determined that plaintiff was last seen leaving the residence driving a white Ford F150 pickup truck with Missouri license plate number 4DCG98.  [*Id.* at ¶10, Doc. 97-2 at p. 52, Lines 12-13].  Investigator Thompson then proceeded in his marked patrol vehicle to search for plaintiff and his white Ford F150.  [*Id.* at ¶11, Doc. 97-1 at ¶10].

While searching for plaintiff and his white Ford F150, Investigator Thompson located a white Ford F150 pickup truck stopped behind a building on the north side of Highway 53 at or near its intersection with Thomas Street.  [Doc. 97 at ¶12, Doc. 97-1 at ¶11].  Investigator Thompson ultimately ended up following the pickup truck as it traveled north on Thomas Street and confirmed the license plate number that belonged to the suspect.  [*Id.* at ¶¶12, 13; Doc. 97-1 at ¶¶11, 12].

Investigator Thompson then initiated a traffic stop by activating the emergency lights on his marked patrol vehicle.  [*Id.* at ¶15; Doc. 97-1 at ¶14].  The driver of the pickup truck, later to be confirmed as plaintiff, pulled into a nearby parking lot.  [*Id.* at ¶16; Doc. 97-1 at ¶15].  Investigator Thompson had personal knowledge that plaintiff was the suspect in the shooting earlier that day, so he believed there to be a high probability that he had a firearm or weapons with him.  [*Id.* at ¶18; Doc. 97-1 at ¶18].  Since Investigator Thompson was the only officer at the scene and was armed with the information about the possible firearm or weapons, he exited his patrol vehicle with his AR-15 rifle pointed towards plaintiff in the driver's seat and ordered him to exit the vehicle.  [*Id.* at ¶¶19, 20; Doc. 97-1 at ¶¶17, 19].

When plaintiff exited the vehicle, Investigator Thompson instructed him to put his hands up.  [*Id.* at ¶¶21, 22; Doc. 97-1 at ¶¶20, 21; Doc. 97-2 at p. 54, Lines 2-6].  He then

3

told him to walk to the rear of the pickup truck and put his hands behind his back.  [*Id.* at ¶¶23, 24; Doc. 97-1 at ¶21; Doc. 97-2 at p. 57, Lines 16-18].  Plaintiff complied with Investigator Thompson; and, Investigator Thompson handcuffed plaintiff's hands behind his back consistent with the procedures of the Butler County Sheriff's Department and his training at Southeast Missouri Law Enforcement Academy.  [*Id.* at ¶¶27, 32; Doc. 97-1 at ¶¶24, 25; Doc. 97-2 at p. 57, Lines 16-20].

Plaintiff testified that he told Investigator Thompson that he had injured his shoulder "real bad" a few hours ago and asked to be handcuffed in front.  [Doc. 97-2 at p. 55, Lines 17-20].  Investigator Thompson told plaintiff he would not handcuff him in front since Investigator Thompson was concerned about safety since plaintiff was suspected of shooting another individual earlier that day.  [Doc. 97 at ¶¶31, 32; Doc. 97-1 at ¶¶22, 25].  Plaintiff complied when Investigator Thompson told him to place his hands behind his back near his waistline.  [Doc. 97-2 at p. 57, Lines 16-20].  Investigator Thompson handcuffed plaintiff's left hand in a normal manner.  [*Id.* at p. 58, Line 5].  Plaintiff then testified that Investigator Thompson took plaintiff's right hand and twisted his palm outward and up as he handcuffed his right hand.  [*Id.* at p. 59, Lines 12-20].  Plaintiff testified that he knew Investigator Thompson had handcuffed his right hand like that in an effort to preserve gunshot residue on plaintiff's right hand.  [*Id.* at p. 59, Lines 16-17].  However, plaintiff testified that he believed that his alleged shoulder injury was exacerbated while he was handcuffed and made to lean over the hood of Officer Thompson's patrol vehicle.  [Doc. 89-1 at p. 52, Line 25-p. 62, Line 11].

Investigator Thompson was the only law enforcement officer at the scene at the

time he handcuffed plaintiff.  [Doc. 97 at ¶33; Doc. 97-1 at ¶26].  During his interaction with plaintiff at the traffic stop and arrest, Investigator Thompson never punched, hit, or kicked plaintiff.  [*Id.* at ¶34; Doc. 97-1 at ¶27].  Investigator Thompson also never used any object to strike or hit plaintiff during his arrest or at any other time.  [*Id.* at ¶35; Doc. 97-1 at ¶28].  Investigator Thompson never used a taser on plaintiff at any time.  [*Id.* at ¶36; Doc. 97-1 at ¶29].  Another officer ultimately transported plaintiff to Butler County Jail.  [Doc. 97 at ¶37; Doc. 97-1 at ¶30].

## B.  Dr. Christopher Montgomery

Plaintiff testified that he first injured his shoulder in 2002 when he tore his rotator cuff playing handball and lifting weights while at Algoa Correctional Center.  [Doc. 89-1 at p. 111, Lines 8-21].  Plaintiff was incarcerated on numerous occasions after his initial injury in 2002.  [*Id.* at p. 105-110].  During his imprisonment in 2011, plaintiff was seen multiple times for pain in his shoulder and feeling like "something is broke on my shoulder."  [Docs. 89-1 at p. 105, Line 15-p. 106, Line 3; 89-6; 89-7; 89-8; 89-9; 89-10].  A right shoulder x-ray showed "changes of the distal clavicle [that] suggest prior fracture with ununited fracture seen along the inferior aspect of the distal clavicle.  Soft tissue calcification or other etiology cannot be excluded."  [Doc. 89-11].  Later in 2011, plaintiff saw a nurse and told her that he reinjured his shoulder a month earlier lifting weights.  [Doc. 89-18].  He was given various medications to assist with the pain, and he was told not to lift weights.  [Doc. 89-20].

In March 2012, plaintiff was given steroid injections and was, again, told to reduce his activity to moderate lifting.  [Doc. 89-23].  In June 2012, plaintiff submitted

numerous medical service requests for additional steroid injections. [Docs. 89-24, 89-25]. After examination, plaintiff was not given additional steroid injections; but, instead, was ordered lay-in restrictions on activities with his right arm and right hand, lower bunk, shoulder rehab exercise, and acetaminophen. [Doc. 89-28]. In July 2012, plaintiff submitted a medical service request asking that the lay-in restrictions be lifted so that he could exercise his shoulder. [Doc. 89-32]. In August 2012, plaintiff submitted another medical service request asking for steroid injections for his shoulder, back and hip. [Doc. 89-33]. He was instructed that he did not need both injections and oral steroids; and, he was ordered to take oral steroids for 30 days. [Doc. 89-34]. By September 2012, plaintiff reported that his shoulder felt much better and his complaints shifted more to back pain. [Doc. 89-37].

By October 2012, plaintiff was again complaining of shoulder pain and wrote a medical service request seeking another shot for his shoulder and back. [Doc. 89-39]. When plaintiff was seen on October 19, 2012, the doctor noted that the medical records showed an ununited past right clavicle fracture. [Doc. 89-40]. As such, the treating physician at that time ordered injections and an oral medication for muscle spasms. [*Id.*]. Plaintiff was then released from custody. [Doc. 89-1 at p. 107, Line 13-24].

Plaintiff was reincarcerated in 2014 after a probation violation. [Doc. 89-1 at p. 107, Line 19-p. 108, Line 3]. As soon as he was in custody again, plaintiff started submitting medical service requests looking to be back on prednisone. [Docs. 89-41, 89-42]. In response, in May 2014, plaintiff received a lay-in restriction for poor use of his right arm; but, he was not given steroids. [Doc. 89-43]. He did have another x-ray of his

6

right shoulder that showed a healed fracture of the distal clavicle with mild degenerative changes of the acromioclavicular articulation with no indication of an acute osseous injury. [Doc. 89-44]. After reviewing the x-ray, plaintiff's providers diagnosed that the fracture had healed with some residual arthritis. [*Id.*].

In August 2014, plaintiff again complained of right shoulder pain and some deformity of his clavicle visible in his previous x-rays. [Docs. 89-45, 89-46]. He was ordered a prescription for 10 mg oral prednisone for 6 days, but he was not treated with steroid injections. [*Id.*]. Plaintiff submitted several other medical service requests in August and September 2014 complaining of right shoulder pain along with various other medical infirmities. [Docs. 89-47, 89-50, 89-51]. Plaintiff was seen again in October 2014 and was ordered a dose-pack of prednisone followed by prednisone tablets. [Doc. 89-52]. On October 21, 2014, plaintiff self-declared a medical emergency indicating that he needed medicine for his shoulder pain. [Doc. 89-55]. The pharmacy ordered his prednisone, and plaintiff was otherwise ordered to fill out a medical service request. [*Id.*]. On October 24, 2014, plaintiff again self-declared a medial emergency for chest pain and his right shoulder. [Doc. 89-56]. He was prescribed heartburn medication, but no additional steroids were ordered. [*Id.*]. Shortly thereafter, plaintiff was again released from custody. [Doc. 89-1 at p. 108, Line 25-p. 109, Line 4].

The Court has been provided with no medical history for plaintiff from 2014 to 2020. [Doc. 89 at ¶65]. Plaintiff testified that he did not seek any medical treatment for his shoulder from 2014 to 2016. [Doc. 89-1 at p. 113, Lines 19-21]. Plaintiff was then in federal custody from 2016 until June 8, 2020. [*Id.* at p. 110, Lines 13-15]. He testified

that once he was in federal custody, he received hydrocortisone shots and pills to treat his shoulder. [*Id.* at p. 113, Lines 22-25]. He also testified that x-rays were taken. [*Id.* at p. 114, Lines 4-8]. Plaintiff then went to a halfway house before he was paroled. [*Id.* at p. 110, Line 18-p. 111, Line 3].

On November 13, 2020, plaintiff was arrested and imprisoned at Butler County Jail and completed a medical screening form indicating, among other things, he had a "shoulder broke". [Doc. 89-58]. Dr. Christopher Montgomery was a physician at the Butler County Jail at the time plaintiff was incarcerated. [Doc. 89-57].

On December 14, 2020, plaintiff submitted a medical service regarding bumps on his genital area. [Doc. 89-59]. Dr. Montgomery saw plaintiff on December 16, 2020, and documented his prior medical history of hypothyroidism and that he had been off his medication since September. [Doc. 89-57 at ¶9; Doc. 89-61]. Plaintiff's reported symptoms included dizziness, weakness, lack of sleep, nausea, and headache. [*Id.*]. Dr. Montgomery also noted lesions on plaintiff's genital area. [*Id.*]. Dr. Montgomery treated the rash or lesions and ordered lab tests to check plaintiff's thyroid and test for syphilis and herpes. [*Id.*]. There is no indication that plaintiff mentioned his shoulder to Dr. Montgomery during this visit. [*Id.*].

On December 26, 2020; January 5, 2021; February 18, 2021; and February 19, 2021, plaintiff submitted medical service requests relating to the ointment and antibiotics for his genital area. [Docs. 89-63, 89-64, 89-65, 89-66, 89-67, 89-68, 89-69, 89-70, 89-71, 89-72, 89-73, 89-74, 89-57 at ¶¶10-13]. Plaintiff did not mention his shoulder in any of these requests. [*Id.*]. On February 24, 2021, Dr. Montgomery saw plaintiff again and

8

ordered lab tests for Hepatitis A, B, and C, HSV 1 and 2, RPR, and HIV to assess plaintiff's genital symptoms and T3, T4, and TSH to evaluate his thyroid.  [Docs. 89-75, 89-76, 89-77, Doc. 89-57 at ¶14, 89-78].  Again, plaintiff did not mention his shoulder in any of these requests.  [*Id.*].  For the remainder of February 2021, plaintiff's only interactions with Dr. Montgomery were related to treatment of his genital area and thyroid testing.  [Doc. 89-57 at ¶¶15-17].

On October 8, 2021, plaintiff saw Dr. Montgomery relating to the history of his nerve damage to his shoulder and neck, chronic arthritis, and PTSD.  [Docs. 89-79, 89-80, 89-81, 89-57 at ¶18].  Dr. Montgomery's notes indicate that plaintiff was previously treated with naproxen and Gabapentin.  [*Id.*].  Dr. Montgomery further noted that plaintiff was "having quite a bit of pain", "has had some racing thoughts and difficulty sleeping" and "has asymmetry of his reach as he has had some sort of nerve damage to the right shoulder questionable brachial plexus."  [*Id.*].  Dr. Montgomery prescribed gabapentin 600 mg twice daily.  [*Id.*].  He further instructed plaintiff to follow-up with prison staff to assess the effectiveness of the treatment plan.  [*Id.*; Doc. 89-1 at p. 167, Lines 5-12].

On November 12, 2021, plaintiff submitted a medical services request requesting an increase in his gabapentin.  [Docs. 89-82, 89-83, 89-84, 89-57 at ¶19].  Dr. Montgomery agreed to increase the gabapentin dose to 800 mg three times daily.  [*Id.*].

On December 11, 2021, plaintiff submitted another medical services request for antibiotics from an alleged staph infection from another inmate.  [Docs. 89-85, 89-86, 89-87, 89-57 at ¶20].  There was no mention in this medical services request about his shoulder.  [*Id.*].  On December 17, 2021, plaintiff wrote another medical service request

9

asking that his bipolar disorder and depression medication be increased. [Docs. 89-90, 89-91, 89-92, 89-57 at ¶22]. Again, plaintiff did not mention his right shoulder in this request. [*Id.*]. On January 17, 2022, plaintiff wrote another medical service request relating to a hemorrhoid and a request for triple antibiotic cream. [Docs. 89-93, 89-94, 89-95, 89-57 at ¶24]. There was no mention in this request regarding his right shoulder. [*Id.*]. On January 23, 2022, plaintiff reported a wound on his buttock. [Doc. 89-57 at ¶25, Docs. 89-88, 89-89]. There was no indication of pain in his right shoulder. [*Id.*]. Then, on January 27, 2022, plaintiff submitted another medical service request about his staph infection and "excruciating pain." [Docs. 89-96, 89-97, 89-98, 89-57 at ¶26, 89-1 at p. 172, Line 19-p. 174, Line 1]. Again, there was no indication about pain in his right shoulder. [*Id.*].

The records do not show any additional medical service requests in plaintiff's file again until June 19, 2022, when plaintiff submitted a medical service request for "hep c treatment." [Docs. 89-102, 89-103, 89-57 at ¶27]. There was no mention in this medical services request about his shoulder. [*Id.*]. Then, on August 17, 2022, plaintiff told Shane Slone that he was interested in monthly steroid injections for his shoulder pain. [Doc. 89-104, 89-105, 89-106, 89-57 at ¶28, 89-1 at p. 174, Line 2-p. 175, Line 23]. Plaintiff was informed that "they normally do not give those here at the jail just oral medications." [*Id.*]. When plaintiff became upset, he was told that Dr. Montgomery would be consulted. [*Id.*]. Dr. Montgomery responded to plaintiff's request for steroid injections that "they do not prescribe monthly steroid injections and is not considered a medical emergency that when he gets out he can see ortho." [*Id.*]. Dr. Montgomery no longer

provided services to plaintiff at Butler County Jail after November 10, 2022.  [Doc. 89-57 at ¶6].

Following Dr. Montgomery's departure, plaintiff wrote medical services requests complaining of chronic pain and arthritis from broken bones and nerve pain, requesting gabapentin, requesting a doctor visit, and indicating that he believed he needed an x-ray because he was in pain all the time and believed his shoulder was broken.  [Docs. 89-107, 89-108].  Plaintiff had a shoulder x-ray in December 2022, that revealed that there were no fractures, that the coracoclavicular joint was normal, and the glenohumeral joint was unremarkable.  [Doc. 89-110].  The x-ray did show degenerative spurring off the distal clavicle with narrowing of the AC joint.  [*Id.*].  Then, in February 2023, plaintiff had an x-ray of his scapula, which did not show any fractures either.  [Doc. 89-111].

On March 13, 2023, plaintiff saw Dr. Christine A. Herrington and reported chronic shoulder pain and told her that he had fallen off a fence in 2020 before he was in prison. [Doc. 89-112].  Plaintiff denied having received treatment while in Butler County Jail and requested steroid injections in both shoulders.  [*Id.*].  Dr. Herrington ordered oral prednisone and scheduled plaintiff for bilateral intra-articular injections.  [*Id.*].  She educated plaintiff on the fact that he could do no more than 4 injections in his lifetime for each joint and that they could be done no sooner than 4 months apart.  [*Id.*].  Plaintiff acknowledged the risks and benefits of the injections before Dr. Herrington administered them on March 29, 2023.  [Doc. 89-113].  He was instructed to avoid heavy lifting that would continue his chronic pain.  [*Id.*].

In May 2023, plaintiff reported again that he had constant pain in his right

shoulder and requested to be seen by a doctor. [Doc. 89-114]. On June 12, 2023, plaintiff saw nurse practitioner Dana Jost. [Doc. 89-115]. Nurse practitioner Jost found scapular winging on the plaintiff's right shoulder that was "not very severe." [*Id.*]. She prescribed Pyridoxine HCl and Ibuprofen for his pain, and requested a referral for physical therapy to assist with his scapular winging symptoms. [*Id.*; Doc. 89-116]. The reviewing doctor denied the request. [*Id.*].

In July 2023, plaintiff complained again of right shoulder pain and stated that Gabapentin helped the pain go from 10/10 to a 5/10. [Doc. 89-117]. He again requested physical therapy and pain medication. [*Id.*]. On July 25, 2023, nurse practitioner Jost prescribed a scheduled series of oral Prednisone. [*Id.*].

On October 23, 2023, plaintiff again complained to nurse practitioner Jost about his right shoulder and requested an x-ray. [Docs. 89-118, 89-119]. Nurse practitioner reminded plaintiff that he had just had x-rays [*Id.*]. When plaintiff insisted he needed surgery, nurse practitioner Jost told him there was no surgery to fix his scapular winging. [*Id.*]. Then, on January 11, 2024, plaintiff requested that nurse practitioner Jost put him on Naproxen for his shoulder pain. [Doc. 89-120].

### 1.    *Plaintiff's Admissions*

Plaintiff has made several admissions related to his claim that Dr. Montgomery failed to treat his serious medical condition. First, plaintiff admits that he sustained a shoulder injury before he saw Dr. Montgomery the first time. [Docs. 89-125 at ¶8(d), 89-126 at ¶8]. Plaintiff has, himself, admitted that his shoulder injury is chronic. [*Id.* at ¶8(h) and ¶¶8(j) and 9(c), Doc. 89-127 at ¶2(c)].

## 2.    *Plaintiff's Experts*

Plaintiff disclosed nurse practitioner Dana Jost and Dr. Christine Herrington as experts pursuant to Federal Rule of Civil Procedure 26(a)(2).  [Docs. 89-121, 89-122]. However, no expert reports or opinions have been solicited from either.

In reviewing the records, Dana Jost does not endorse the use of monthly steroid injections; and, in fact, had denied plaintiff's requests for specific medical treatments numerous times.  [Docs. 89-34, 89-37, 89-49, 89-118].  Further, Dr. Herrington does not endorse the use of monthly steroid injections as she specifically told plaintiff he could only have 4 in his lifetime, and they had to be at least 4 months apart.  [Doc. 89-112]. Dr. Herrington's records or notes do not indicate that plaintiff will need surgery specifically because his shoulder was allegedly untreated for a long time.  [Doc. 89-126 at ¶8(m); Docs. 89-112, 89-113].  Both Dana Jost and Dr. Herrington have stated that plaintiff's shoulder injury is a chronic injury.  [Doc. 89-126 at ¶8(j)].[2]

## 3.    *Dr. Montgomery's Declarations*

Dr. Montgomery declared that steroid injections are not done monthly because they carry many serious risks and side effects like infection, nerve damage, reflex sympathetic dystrophy, bleeding, pain, and vascular compromise.  [Doc. 89-57 at ¶¶29,

---

[2] Plaintiff has disclosed two medical literature articles relating to scapular winging.  [Docs. 89-123, 89-124].  However, plaintiff has not disclosed any medical expert that has relied on or cited this medical literature.  Accordingly, both medical literature articles are inadmissible as hearsay and will not be considered by the Court in ruling on the pending motions for summary judgment.  *See Brown v. U.S.*, 419 F.2d 337, 341 (8th Cir. 1969) (finding that the Court will not consider medical treatises for purposes of proving the probative facts of opinions in the articles since they are hearsay).

35].  Dr. Montgomery also declared that oral steroids have risks including development of diabetes, congestive heart failure, adrenal suppression, and weight gain.  [*Id.* at ¶30].  He also declared that Gabapentin treatment has risks like dizziness, ataxia, abnormal gait, tremor, seizures, dysarthria, absent reflexes, movement disorders, and loss of consciousness.  [*Id.* at ¶31].

Dr. Montgomery chose to treat plaintiff with Gabapentin and NSAID's for his shoulder pain because of plaintiff's history of nerve damage and trauma to his shoulder.  [*Id.* at ¶33].  With plaintiff's history of nerve damage and trauma to his shoulder, Dr. Montgomery was concerned about treating him with steroids.  [*Id.*].  Dr. Montgomery opined that treatment with Gabapentin and NSAID's was appropriate since plaintiff had no known serious side effects to that treatment before.  [*Id.*].  Dr. Montgomery prescribed Gabapentin.  [*Id.*].  Dr. Montgomery then increased plaintiff's Gabapentin prescription when plaintiff continued to complain about pain because plaintiff had reported no concerning side effects.  [*Id.* at ¶34].

## III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962); Fed. R. Civ. P. 56(a).  The Court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inference in [that party's] favor."  *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).  "[W]here the

14

nonmoving party will bear the burden of proof at trial on a dispositive issue…Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing'…that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586-87)). "'[T]he mere existence of some alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Otherwise, where the Court finds that "the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party" – where this is no "'genuine issue for trial'" – summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. V. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## IV.    DISCUSSION

As previously stated, the complaint is based upon plaintiff's claims against defendants alleging that defendants violated his constitutional rights when they used unreasonable force to arrest him and failed to treat his serious medical condition while he was incarcerated at Butler County Jail.  Defendant Kellis Thompson's motion for summary judgment alleges (1) that he did not use unreasonable force; and, (2) that he is entitled to qualified immunity.  Defendant Dr. Christopher Montgomery's motion for summary judgment alleges (1) that plaintiff cannot show a serious medical need; and, (2) that plaintiff cannot show that Dr. Montgomery had the required state of mind to prevail on his claim of deliberate indifference to his serious medical needs.  The Court will address each argument in more detail *infra*.

### A. Plaintiff cannot prevail on a claim for unreasonable force against Kellis Thompson.

#### 1. *Kellis Thompson did not use unreasonable force.*

Where an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment…" *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  Thus, an objective "reasonableness" standard must be applied in evaluating claims that law enforcement

16

officers used excessive force in violation of the Fourth Amendment. *Id.* (citing *Graham,* 490 U.S. at 396). However, it is well-established that law enforcement officers may use some degree of physical coercion or threat thereof to effect an arrest or investigatory stop. *Id.*

A law enforcement officer's use of force violates the Fourth Amendment only when it is objectively unreasonable based upon the facts and circumstances of a particular case. *Graham*, 490 U.S. at 397. The facts and circumstances of a particular case are "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396-97. Even if there were other alternatives or actions the officer could have chosen to engage in, an officer need not "pursue the most prudent course of conduct as judged by 20/20 hindsight vision." *Church v. Anderson*, 898 F.3d 830, 833 (8th Cir. 2018) (quoting *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014)).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396. Thus, the reasonableness of a particular use of force can depend on circumstances like the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, whether he is actively resisting arrest or attempting to evade arrest by flight, the duration of the officer's actions, whether the actions take place in the context of effecting an arrest, the possibility that the suspect

17

may be armed, the number of persons with whom the officer must contend at one time, and whether the officers actions were performed pursuant to standard police procedure. *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004) (quoting *Graham*, 490 U.S. at 396); *Clark v. Ware*, 873 F. Supp.2d 1117, 1119-20 (E.D. Mo. 2012) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)); *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995) (finding that police department guidelines are relevant in analyzing whether the force was unreasonable). "[W]hat would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time." *Rodriguez v. Farell*, 280 F.3d 1341, 1353 (11th Cir. 2002). Generally, courts in Missouri have found no excessive force where a pre-existing condition was not objectively manifested or known to the officer. *See Copeland v. Locke*, 613 F.3d 875, 882 (8th Cir. 2010) ("when an officer exerts objectively reasonable force which results in the aggravation of a pre-existing injury unknown to the officer, such an injury is not sufficient to indicate excessive force") (citing *Cavataio v. City of Bella Villa*, 570 F.3d 1015, 1020 (8th Cir. 2009)).

When making an arrest or investigatory stop, an officer must be permitted to not only grab the arrestee but also put him/her in handcuffs when effectuating that arrest. *Kasiah v. Crowd Sys.*, 915 F.3d 1179, 1184 (8th Cir. 2019) (citing *Graham*, 490 U.S. at 396). The handcuffing of an arrestee's hands behind his back is a routine police procedure. *Royster v. Nichols*, 698 F.3d 681, 691 (8th Cir. 2012) (citing *Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996)). An officer's decision not to deviate from this standard

18

practice is a judgment call, pure and simple. *Id.* (citing *Calvi v. Knox Cnty.*, 470 F.3d 422,428 (1st Cir. 2006).

Here, based upon a review of the entire record, plaintiff has not presented any evidence that at the time of the investigatory stop and his arrest that his shoulder injury was visible to Investigator Thompson. Instead, viewing the facts in the light most favorable to plaintiff, he only <u>informed</u> Investigator Thompson that he had a pre-existing injury. As a result, Investigator Thompson followed routine police procedure when he handcuffed plaintiff. Those actions alone do not amount to excessive force.

Further, his actions in handcuffing plaintiff were objectively reasonable considering that Investigator Thompson was the only officer on scene and knew that plaintiff was the lead suspect in shooting another individual. Investigator Thompson did not know whether plaintiff was still armed or posed an immediate threat to Investigator Thompson or other citizens in proximity to the traffic stop. Investigator Thompson followed procedures and policies to secure plaintiff in an objectively reasonable fashion. The fact that plaintiff did not like how Investigator Thompson may have twisted his arms when putting him in handcuffs is not enough to amount to excessive force. *See Blazek v. City of Iowa City*, 761 F.3d 920, 925 (8th Cir. 2014) (quoting *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (holding that the officer did not use unreasonable force as a matter of law when the officer grabbed the plaintiff's arm, twisted it around the plaintiff's back, jerked it up high to the plaintiff's shoulder, and then handcuffed the plaintiff as he fell to his knees screaming that the officer was hurting him, which resulted in a severe aggravation of a prior injury)); *see also Thompson v. City of Lawrence*, 58

19

F.3d 1511, 1516 (10th Cir. 1995) (holding that police officers did not use unreasonable force when they ordered suspected felon with injured shoulder and a reputation for possessing firearms to lie on the floor, handcuffed the suspect's hands behind his back, and then lifted him off the floor by the wrist).

Based upon the foregoing, the Court finds that no genuine issue of material fact exists regarding whether Investigator Thompson used unreasonable force in his investigatory stop and arrest of the plaintiff. Accordingly, the Court will grant summary judgment in favor of defendant Kellis Thompson.

### 2. *Kellis Thompson is entitled to qualified immunity.*

Aside from granting summary judgment on the traditional standards discussed *supra*, Investigator Thompson also asserts in his summary judgment motion that he is entitled to qualified immunity. "Qualified immunity shields public officials from liability for civil damages if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Watkins v. City of St. Louis, Missouri*, 102 F.4th 947, 951 (8th Cir. 2024). Since Investigator Thompson asserted his right to qualified immunity, plaintiff then bore the "burden to prove (1) the defendant violated his constitutional rights; and (2) the law was clearly established at the time of the alleged violation." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). This Court has discretion to decide the order in which these two prongs should be addressed, and, when appropriate, does not need to address both. *Pearson*, 555 U.S. at 236-37.

Here, plaintiff has failed to meet his burden in demonstrating that Investigator Thompson violated his constitutional rights. The Court has found that no constitutional violations have occurred at the hands of Investigator Thompson. *See supra*. Without a constitutional violation having occurred, plaintiff cannot overcome the defendant's claim to qualified immunity. Therefore, the Court finds that Investigator Thompson is also entitled to summary judgment because plaintiff's unreasonable force claim is barred by qualified immunity.

**B. Plaintiff cannot establish an Eighth Amendment claim for deliberate indifference to a serious medical need against Dr. Christopher Montgomery.**

The Eighth Amendment requires that officials provide inmates with needed medical care. *Cullor v. Baldwin*, 830 F.3d 830, 836 (8th Cir. 2016). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Redmond v. Kosinski*, 999 F.3d 1116, 1120 (8th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Deliberate indifference has two components: objective and subjective. *Cheeks v. Belmar*, 80 F.4th 872, 876 (8th Cir. 2003). To prevail, plaintiff must prove two elements: (1) an objectively serious medical need; and, (2) that defendant actually knew of, and deliberately disregarded, that serious medical need. *Corwin v. City of Independence*, 829 F.3d 695, 698 (8th Cir. 2016).

From an objective standpoint, a medical need is serious "if the medical need in question is supported by medical evidence, such as a physician's diagnosis, or is so obvious that even a layperson would easily recognize the necessity for a doctor's

21

attention." *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017).

From a subjective standpoint, deliberately disregarding a serious medical need is "more than negligence, more even than gross negligence.  It may be found where medical care is so inappropriate as to evidence intentional maltreatment." *Presson v. Reed*, 65 F.4th 357, 366 (8th Cir. 2023); *see also Redmond*, 999 F.3d at 1120 (stating that the plaintiff "must show grossly incompetent or inadequate care so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care").  "The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness." *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011). When the allegation is one of lack of treatment, "the failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009).  If the allegation relates more to a delay in treatment, it only arises to the level of an Eighth Amendment violation when the objective seriousness of the deprivation is measured by reference to the effect of delay in treatment.  *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005).  "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id*.  An inmate's self-reporting assertions of pain are insufficient to constitute verifying medical evidence in the absence of corroborating evidence of symptoms. *Hancock v. Arnott*, 39 F.4th 482, 487 (8th Cir. 2022).  An inmate may satisfy the verifying medical evidence requirement by supplying medical records in support of self-reporting

assertions of pain. *Dantzler v. Baldwin*, 133 F.4th 833, 844 (8th Cir. 2025) citing *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

In the present case, plaintiff had a long history of shoulder pain before he ever came under Dr. Montgomery's care at Butler County Jail. Plaintiff indicated on his medical screening form in November 2020 that he had a "shoulder broke", but he never complained again about his shoulder until his October 8, 2021, visit with Dr. Montgomery. [Docs. 89-58, 89-79, 89-80, 89-81, 89-57 at ¶18]. It is clear from the record that when confronted by plaintiff about his shoulder pain, Dr. Montgomery did not ignore or give short shrift to plaintiff's complaints. [*Id.*]. Rather, he conducted a detailed physical examination and reviewed plaintiff's prior treatment history. [*Id.*]. As a result, Dr. Montgomery prescribed Gabapentin. [*Id.*]. About a month later, in November 2021, plaintiff requested that his Gabapentin be increased. [Docs. 89-82, 89-83, 89-84, 89-57 at ¶19]. Dr. Montgomery agreed to plaintiff's request and increased the dosage. [*Id.*].

Plaintiff then went until August 17, 2022, before he next complained about his right shoulder pain when he requested steroid injections. [Docs. 89-104, 89-105, 89-106, 89-57 at ¶28, 89-1 at p. 174, Line 2-p. 175, Line 23]. Dr. Montgomery responded that "they do not prescribe monthly steroid injections and is not considered a medical emergency that when he gets out he can see ortho." [*Id.*]. Plaintiff made no further complaints about right shoulder pain to Dr. Montgomery before Dr. Montgomery ceased providing services at Butler County Jail in November 2022. [Doc. 89-57 at ¶6].

Plaintiff's allegations that Dr. Montgomery was deliberately indifferent to his serious shoulder pain and that Dr. Montgomery's lack of treatment or delayed treatment

has now caused him scapular winging or other shoulder issues are all unsupported by the facts. Most of plaintiff's medical complaints to Dr. Montgomery focused on medical infirmities unrelated to his shoulder. When plaintiff did make his sporadic and inconsistent complaints about shoulder pain, his complaints were never ignored by Dr. Montgomery. Rather, plaintiff was always assessed or provided with a response. Any treatment recommendations by Dr. Montgomery were provided based upon physical assessments and plaintiff's prior treatment history.

In reviewing the totality of the evidence presented, it is clear to this Court that Dr. Montgomery concluded that the appropriate approach to plaintiff's shoulder pain was prescription pain relievers in different dosages to address what he considered to be chronic nerve pain. There is no evidence or indication that plaintiff had any other serious medical need, like a break or fracture, that would have necessitated additional treatment. Dr. Montgomery's denial of plaintiff's specific request for steroid injections was not unreasonable – and certainly does not arise to a level of criminal recklessness, or for that matter, even negligence. Instead, it was merely plaintiff's personal disagreement with Dr. Montgomery for failing to provide the specific treatment that plaintiff requested. *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting plaintiff's "mere disagreement with treatment decisions does not rise to the level of constitutional violation."). There also is no evidence or indication, presented by any expert or in the record itself, that Dr. Montgomery's selected course of treatment caused plaintiff's development of scapular winging, the incorrect healing of a prior injury, or more pain.

Based on the foregoing, plaintiff has failed to meet his burden. In reviewing the

24

record as a whole, this Court finds that no rational trier of fact could find in favor of plaintiff. Therefore, Dr. Montgomery is entitled to summary judgment on plaintiff's Eighth Amendment claim for deliberate indifference.

## V.    CONCLUSION

In conclusion, this Court finds that no genuine issue of material fact exists regarding whether Investigator Thompson used unreasonable force in his investigatory stop and arrest of the plaintiff. Further, this Court finds that Investigator Thompson is entitled to summary judgment because plaintiff's unreasonable force claim is barred by qualified immunity. Finally, this Court finds that Dr. Montgomery is also entitled to summary judgment because no genuine issue of material fact exists to show that Dr. Montgomery was deliberately indifferent to a serious medical need that plaintiff alleges existed.

Accordingly,

**IT IS HEREBY ORDERED** defendant Dr. Christopher Montgomery's Motion for Summary Judgment [Doc. 88] is **GRANTED**. A separate judgment will be entered.

**IT IS FURTHER ORDERED** that defendant Kellis Thompson's Motion for Summary Judgment [Doc. 95] is **GRANTED**. A separate judgment will be entered.

**IT IS FINALLY ORDERED** that the Clerk of Court is **DIRECTED** to **CLOSE** the case.

**SO ORDERED** this 12th day of February, 2026.

STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE